# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––

No 10-CV-4444 (JFB)

––––––––––––––––––

## BALRAM SINGH,

Petitioner,

## VERSUS

## GARY GREENE,

Respondent.

––––––––––––––––––

**MEMORANDUM AND ORDER**
May 20, 2011

––––––––––––––––––

JOSEPH F. BIANCO, District Judge:

Balram Singh (hereinafter, "Singh" or "petitioner"), by way of counsel, petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, to vacate his conviction entered May 26, 2005, in the County Court of the State of New York, County of Nassau (the "trial court"), for murder in the second degree (N.Y. Penal Law § 125.25(3)), assault in the first degree (N.Y. Penal Law § 120.10(4)), arson in the first (N.Y. Penal Law § 150.20(1)) and third degree (N.Y. Penal Law § 150.10(1)), stalking in the third degree (N.Y. Penal Law § 120.50), and menacing in the second degree (N.Y. Penal Law § 120.14). Singh was sentenced to a term of imprisonment of twenty-eight years to life.

Singh challenges his conviction on four grounds. Specifically, petitioner asserts that: (1) the evidence was insufficient to support a finding of guilt beyond a reasonable doubt; (2) the trial court erred by precluding the introduction of evidence of the petitioner's mental capacity; (3) the prosecution failed to disclose potentially exculpatory material in a timely manner; and (4) defense counsel failed to provide effective representation by failing to follow state procedural requirements regarding mental health evidence and failing to move for an adjournment or mistrial upon the discovery of withheld exculpatory material. As discussed below, the petitioner has procedurally defaulted on his second and third grounds for relief. In any event, the Court has examined each of the petitioner's claims on the merits and concludes that there is no basis for habeas relief. All of petitioner's claims are without merit. Therefore, the petition is denied in its entirety on the merits.

## I. Background

### A. Underlying Facts

The following facts are adduced from the instant petition and the record below.

At all times relevant to this case, the petitioner was a mechanic for North Atlantic Energy in the Bronx. (T.[1] at 1146–47.) Petitioner's employer dealt only with the sale and delivery of diesel fuel and Number 2 oil, not gasoline. (*Id.* at 1109.) The employer did use a gasoline-powered forklift at the site for deliveries, which petitioner occasionally worked on. (*Id.* at 1110, 1190.) However, petitioner's primary job duties consisted of "[a]nything to do with the trucks[,]" including the repair and maintenance of diesel truck engines and transmissions. (*Id.* at 1177.)

The petitioner met Holika Mangroo ("Holika") in 2000, and the two began dating during the summer of 2003. (*Id.* at 983–84.) In early 2004, Holika and the petitioner became engaged and started living together. (*Id.* at 984-85.) Holika ended the relationship in late March or early April of 2004; one of the reasons for the breakup was that the petitioner shoved her against a door during an argument. (*Id.* at 986.) After this happened, Holika moved into her family's apartment at 45 Broadway, Apartment 1Z, Freeport, New York (hereinafter, "Mangroo Apartment"). (*Id.* at 991.)

The breakup was the beginning of a months-long pattern of violent harassment against Holika by the petitioner. The petitioner repeatedly called Holika at work and at her apartment. (*Id.* at 987–91.) On May 27, 2004, petitioner approached Holika as she was walking to a train station. (*Id.* at 991–93.) Singh lifted his shirt up and showed Holika his gun, threatening to use it on her. (*Id.* at 993.) Holika convinced the petitioner to return to her apartment. (*Id.* at 994–95.) Petitioner ultimately left without becoming more violent. (*Id.* at 995.)

On June 4, 2004, a Ford Expedition SUV owned by Holika's sister Salima Ishmail ("Salima") was set on fire. (*Id.* 998.) Although owned by Salima, the SUV was used by Holika and other family members. (*Id.* at 997.) The petitioner had previously traveled in the SUV. (*Id.* at 997–98.) A neighbor observed a gray Honda with clear tail lights leaving the scene of the SUV fire. (*Id.* at 1219–20.) The petitioner owned a gray Honda Civic with clear tail lights. (*Id.* at 543, 996, 1266.) An arson detective concluded that the SUV had been intentionally set on fire. (*Id.* at 841.)

On June 11, 2004, the petitioner went to the bank where Holika worked and demanded to see her. (*Id.* at 1002–04.) Two bank employees told him to leave, which he did. (*Id.* at 1202–03.) Holika reported the incident to the police. (*Id.* at 1004.)

On June 24, 2004, Singh approached Holika as she left her sister's apartment. (*Id.* at 1005.) Holika attempted to flee back inside the apartment, but the petitioner caught up with her outside the apartment door and grabbed her. (*Id.*) Petitioner only let Holika go after she screamed for help. (*Id.*) Holika's sister was able to open the door and let Holika in, where she then called the police to report the incident. (*Id.*)

On the evening of July 4, 2004, James Cavanagh, a co-worker of the petitioner, discovered Singh on the company's grounds despite not being scheduled to work at that time. (*Id.* at 1148–49.) Petitioner told Cavanagh that his cousin's car had run out

[1] "T." refers to the trial transcript.

of gas and asked to borrow one of the company's gas cans. (*Id.* at 1150–51.) Cavanagh gave the petitioner permission to borrow the can and observed the gas can in the trunk of petitioner's Honda Civic. (*Id.* at 1148–51.) After having a cup of coffee with the petitioner, Cavanagh saw him drive away in his Civic, with the gas can in the trunk, sometime after 9:00 p.m. (*Id.* at 1148, 1151, 1181.)

At approximately 3:50 a.m. on July 5, 2004, the Mangroo Apartment became engulfed in flames. (*Id.* at 1008.) Sleeping inside the apartment at the time the fire began were Holika's mother Basmattie Mangroo, Holika, Salima, Salima's husband Intiaz Ishmail ("Intiaz"), and Salima and Intiaz's two young children. (*Id.* at 1007–08.) The sound of the flames awoke Holika, who called 911 after waking up her mother. (*Id.* at 1008–09.)

Firefighters arrived at the apartment building shortly thereafter. (*Id.* at 550, 575, 595.) Firefighters were able to enter the apartment and rescue most of its occupants. (*Id.* at 577–78, 629, 645–46.) However, they were unable to save Salima Ishmail, who died from smoke inhalation. (*Id.* at 601, 1246.) In addition, several other occupants suffered serious injuries. The Ishmails' six-year-old daughter Afsaana suffered carbon monoxide poisoning, while their one-year-old son received second-degree burns to the face, forehead, right arm and right leg. (*Id.* at 616–20.) Intiaz suffered a collapsed lung and burns to his right arm. (*Id.* at 791–95.)

After the blaze was extinguished, Nassau County Fire Marshal Investigator James Hickman ("Fire Investigator Hickman") visited the site of the fire. (*Id.* at 1622.) Hickman concluded that the fire was the result of arson. (*Id.*) His conclusion was based on burn patterns, the presence of

accelerant pour patterns on the floor near the apartment door, and the elimination of any electrical or accidental causes. (*Id.* at 1620–23.)

Video surveillance from the Metropolitan Transportation Authority (MTA) Bridge and Tunnel Authority showed that a driver with a deformity on his left index finger drove over the Whitestone Bridge from the Bronx onto Long Island at around 1:28 a.m. on July 5; the petitioner had the same deformity. (*Id.* at 1430, 1445, 1454, 1486–91.) Surveillance showed the same car reentering the Bronx via the bridge at 4:25 a.m., about thirty-five minutes after the apartment fire started. (*Id.* at 1491–95.) According to Nassau County Police Detective David Nystrom, a person could easily drive from the Mangroo Apartment to the Whitestone Bridge in under thirty-five minutes. (*Id.* at 484–86.)

Petitioner was arrested as he drove away from the grounds of North Atlantic Energy in the afternoon of July 5. (*Id.* at 1262, 1265–66.) Scientific testing of the baseball cap and work shirt petitioner was wearing at the time confirmed the presence of gasoline. (*Id.* at 1353–54, 1393-94, 1413.) Petitioner's employer did not deliver or sell gasoline, although the petitioner occasionally worked on the employer's gasoline-powered forklift. Gasoline was not found on any of the petitioner's other clothes. (*Id.* at 1401.)

The day after petitioner's arrest, a coworker at North Atlantic Energy discovered a cloth trunk liner inside the compressor compartment of one of the company's flatbed trucks. (*Id.* at 1178–81.) The liner found in the compressor compartment was the same color as the one that one of petitioner's co-workers had previously seen in petitioner's car. (*Id.* at 1181–82.) The trunk liner of petitioner's car

was missing at the time of his arrest. (*Id.* at 836–37.) However, no traces of gasoline were found on the trunk liner discovered in the compressor compartment. (*Id.* at 1406.)

Samuel Maglione ("Maglione"), a retired fire chief from New Jersey, testified as an expert on behalf of the defense. Maglione viewed photographs of the Mangroo Apartment after the fire and reviewed testimony of the firefighters about the aftermath of the fire, but did not visit the actual scene of the fire. (*Id.* at 1814-15.) Based on these photographs, Maglione concluded that the fire was not the result of arson, but rather was an accidental fire that began in a closet in the apartment. (*Id.* at 1848.) On cross-examination, Maglione conceded that he could not be sure that the fire started in the closet and could not rule out that gasoline could have been used as an accelerant. (*Id.* at 2003-04.)

The defense also recalled Fire Investigator Hickman. Based on an out-of-court encounter with Hickman, defense counsel attempted to elicit from Hickman testimony that a "saddle" was present under the door of the Mangroo Apartment and that a saddle would have prevented gasoline from entering the apartment. (*Id.* at 2031–34.) Hickman denied that he believed that a saddle was in fact present. (*Id.* at 2032.)

## B. Procedural History

Petitioner was indicted on eleven counts stemming from the fire itself and his conduct leading up to the fire. Specifically, petitioner was charged with murder in the first degree, two counts of murder in the second degree, two counts of assault in the first degree, two counts of arson in the first degree, arson in the third degree, reckless endangerment, stalking in the third degree, and menacing in the second degree.

## 1. Competency Hearings

Prior to petitioner's trial, the trial court held two competency hearings pursuant to N.Y.C.P.L. § 730.30. At the first hearing, held intermittently from August 30 to September 8, 2005, the State called two forensic psychologists—Drs. Tracy Grossman and Allen Reichman—as experts. These psychologists testified that, in March 2005, they performed a thirty-to-forty-minute court-ordered mental examination of the petitioner to determine his competency to stand trial. (P.T.[2] 8/30/05 at 3–6, 43–45.) Based on this examination, both experts concluded that the petitioner was malingering by attempting to appear more mentally impaired than he actually was. (*Id.* at 6–12, 62–64.) This conclusion was based on petitioner's assertions during the examination that he could not remember who was president during the September 11 attacks and that he believed there were nine days in a week. (*Id.* at 11, 64–65.) Their conclusion was also based on the results of the REY Fifteen Item Test ("REY test"), a basic memory test used to tell if someone is feigning mental retardation or illness. (*Id.* at 10–12, 59–63.) Finally, the State's experts also based their conclusion on the discrepancies in the petitioner's use of language and ability to respond to questions during the examination, as well as the fact that the petitioner was able to work in a steady job that required memorization and ability to work with others. (*Id.* at 15–16.)

Dr. Adam Raff, a psychiatrist retained by the defense to examine the petitioner, testified during the first hearing that the petitioner suffered from depression and "some level of mental retardation." (P.T.

---

[2] "P.T." refers to the transcripts from the pretrial competency hearings.

8/31/05 at 102.) This led Dr. Raff to conclude that the petitioner was not fit to stand trial. (*Id.* at 102.) Dr. Raff's assessment was based on Dr. Raff's two-hour examination of the petitioner. (*Id.* at 96.) Dr. Raff further expressed doubts about the brevity of the examination performed by Drs. Grossman and Reichman, as well as the propriety of the REY test they administered during that examination. (*Id.* at 100–102.)

The defense also called Dr. Marc Janoson, a forensic psychologist, who testified that the petitioner was not fit to stand trial. (P.T. 9/2/05 at 265.) Based on a series of meetings with the petitioner, Dr. Janoson found that the petitioner's full scale intelligence quotient ("I.Q.") was fifty-seven, within the mild range of retardation. (*Id.* at 276.) Dr. Janoson likewise criticized the use of the REY test during the state's examination, noting that the test is meant to rule out, not rule in, malingering and has a less than five percent chance of correctly identifying malingerers. (*Id.* at 265–66, 276.) Based on his own tests, Dr. Janoson concluded that the petitioner was not malingering. (*Id.* at 265.)

On October 24, 2005, the trial court ordered further examination of the petitioner by different examiners. *People v. Singh*, Indictment#: 1610N-04, at 7 (N.Y. Civ. Ct. Oct. 24, 2005). This order was based on the fact that the State had failed to provide proper notice for one of the State's examinations, the State psychiatrist's use of the simplistic REY test, and the fact that the court had doubts about the validity of the competency tests performed by Dr. Janoson. *Id.* at 3, 5-7.

A second § 730.30 hearing was held on December 12, 2005. At this hearing, the State called Dr. Anthony Santoro, a psychologist who examined the petitioner to determine his competency. (P.T. 12/5/05 at 7–8.) Based on his observations of the petitioner during this examination, Dr. Santoro testified that the petitioner was not incapacitated, did not suffer from clinical depression, and was fit to stand trial. (*Id.* at 20–21.) The State also called Dr. Alexander Bardey, a psychiatrist who had separately examined the defendant. (*Id.* at 50.) Like the State's experts in the first hearing, Dr. Bardey concluded that the petitioner was malingering during the examination and was fit to stand trial. (*Id.* at 63–65.) Dr. Bardey also testified that, although the petitioner had a low intelligence, his level of functioning did not support a finding of mental retardation. (*Id.* at 69.)

The defendant did not present additional witnesses at the second hearing and relied solely on the testimony of Dr. Janoson and Dr. Raff. At the conclusion of the second hearing, the court ruled from the bench that the petitioner was competent to stand trial. (P.T. 12/12/05 at 84-85.)

2. Psychiatric Evidence Colloquy

On March 2, 2006, right before jury selection was to begin, the prosecution informed the trial court that it believed the petitioner intended to use psychiatric testimony at trial. (T. 16–17.) The State opposed the introduction of such evidence on the grounds the defense failed to provide written notice of intent to use such psychiatric evidence within the time frame required by N.Y.C.P.L. § 250.10.[3] (*Id.* at

_____

[3] This provision reads, in pertinent part:

Psychiatric evidence [offered by the defendant] is not admissible upon a trial unless the defendant serves upon the people and files with the court a written notice of his intention to present psychiatric evidence. Such

17–18.) The State also objected to such evidence because

> [t]he defense has argued from the beginning that the defendant is not guilty of these crimes because he wasn't present when these crimes took place. Retardation would have nothing to do with whether or not he was present or wasn't present. . . . If we were at this point to try to hire a psychologist to test the defendant to make determinations about his mental state of and whether or not he is or isn't retarded . . . where do we go? We would need a specialist in the area of I.Q. and retardation. . . . we would have to work out some kind of scheduling with that specialist. Testing for retardation, I.Q. testing takes days, or certainly can. . . we would have a right to do an investigation to bring up other sources of information that would establish that the defendant is not retarded. That's more or less a full-blown investigation. We don't have time for that, we're starting the jury selection today.

(*Id.* at 17-18.) In response, defense counsel referred back to the competency hearings as evidence of the defendant's impaired mental

---

notice must be served and filed before trial and not more than thirty days after entry of the plea of not guilty to the indictment. In the interest of justice and for good cause shown, however, the court may permit such service and filing to be made at any later time prior to the close of the evidence.

N.Y.C.P.L. § 250.10(2).

capacity. (*Id.* at 19–21.) Defense counsel told the court:

> I'm not saying to you right here and now that we intend to use a psychiatrist. I'm saying to you that the occasion may occur if a situation does come forward where the prosecution alleges that certain capacity on the defendant's part where we will establish if they so put forward and the door is there is to open, that the capability or lack of capability on this defendant, which has been established by our previous psychiatric evaluation, and the evaluations not only by the DA, the separate evaluation by the Court aside from—in other words, five doctors examined him thus far and when they claim oh, it would put us in such a difficult situation, it's all in the record, they have it.

(*Id.* at 20–21.)

The trial court said the petitioner had failed to provide the statutorily required notice. (*Id.* at 21.) Despite this lack of notice, the trial judge told counsel:

> [T]he Court will not preclude the defendant at this time from offering evidence should the People open the door with respect to issues raised by defense counsel. However, if in fact that occurs or counsel believes that occurs, I would probably at that time require an off—excuse me, an on the record out of the presence of the jury offer of proof with respect to any evidence you intend to put forward.

(*Id.* at 21–22.)

On March 6, 2006, just prior to voir dire, the issue of psychiatric evidence again came up. The following colloquy occurred:

DEFENSE COUNSEL: Interestingly enough, though, your Honor, the door may have already been opened while the People stayed [*sic*] that they intend to introduce, or they rely upon the case—the occurrence of certain events prior to the alleged arson, to wit, the arson of the car and the stalking, as motive, which they state in their papers is motive.

It is going—it will be our contention that our client, based upon his quick, logical debilitation, does not have the ability to formulate that motive which the prosecution themselves have opened the door to. And, mind you, there is no requirement, as stated before, to charge a motive. It's not a necessary element of the crime. But motive bespeaks a conscious planning an act to formulate certain acts.

The prosecution claims that the two particular charges in the indictment go to establish the motive. . . . But it just comes to mind that it does open the door to establish whether he's capable now of formulating a conscious effort of belief to formulate a motive. Not because he is of such a psychological depressed state, or some kind of psychological disability, simply because is able to do so with an IQ of 55.

THE PEOPLE: Defense counsel is referring to a mental defect. We had no notice, no 250.10 notice of any defense having any mental defect. We haven't had a chance to hire our own psychologist to administer IQ

tests to establish that this defendant is not retarded.

. . .

Is defense counsel now telling us he hopes to establish that this defendant is incapable of forming a motive to do anything? That is obvious reference to a mental defect and we object to it, Judge. It's not fair. We cited the case law and we ask the Court to preclude defense counsel from doing any such think [*sic*].

DEFENSE COUNSEL: You know, it's just basically not logical for the prosecution to state here before this Court they had no notice that my client had a mental defect. We had protracted litigations and hearing. They had two psychiatrists examine my client, as we had two psychiatrists. And then the Court had another psychiatrist. So a total of five psychologists and psychiatrists have examined my client. . . . Now, I'm not saying he could not have consciously or physically done the fact charged to the crime. I'm just suggesting he might not have been able to formulate the protracted motive as indicated by the fact that the People have chosen to join three separate cases in one to prejudice the defendant's case.

(*Id.* at 34–36.)

The court stated its belief that "defense counsel is trying to . . . bootstrap his way into getting a mental disease defect in with respect to attempt to commit this crime, whether the defendant could form that intent." (*Id.* at 37.) The court reiterated its

ruling on the use of psychiatric evidence from the March 2 proceeding:

> The Court ruled that I was not going to prejudge any evidence, if the People opened the door and the defendant tried to get certain evidence in. With respect to the defendant's capabilities, the Court did not make a particular ruling, did not close the door from you trying to get evidence in with respect to that. It's a question of the manner in which you try to get that in. . . . But the People did put in an affirmation in opposition to any notice with respect to mental disease or defect. . . . The Court ruled that that would not be admissible.
>
> . . .
>
> As I said, I'm not ruling with respect—I am ruling with respect to the mental disease or defect, I'm leaving the door slightly ajar with respect to if the People open anything with respect to motive. But at this time it doesn't appear likely that the Court would admit that testimony.
>
> However, the Court said on Thursday, if in fact it got to that the [*sic*] point, the Court would ask for an offer of proof from defense counsel, and the Court is still going to rule that way.

(*Id.* at 33-34, 37.)

At no point during either the March 2 or the March 6, 2006 proceeding did defense counsel offer to show good cause justifying late notice beyond stating that the prosecution was on notice based on the competency hearing. Additionally, defense counsel did not raise any contemporaneous constitutional objections based on the trial court's ruling.[4] Defense counsel did not attempt to introduce psychiatric evidence at trial, and the jury heard no testimony regarding petitioner's mental capacity.

### 3. Trial

Prior to trial, the prosecution disclosed, as part of their *Rosario* material,[5] a handwritten note from a police detective that four or five months before the apartment fire, Intiaz Ishmail's brothers had a dispute with an individual nicknamed "King" in which they broke the windshield on King's car. Toward the end of the government's case, defense counsel notified the court that he had discovered that "King" was in fact Totaram Mangroo ("Totaram"), Holika's and Salima's brother, who on occasion lived in the Mangroo Apartment. (*Id.* at 742–43, 1631–32.) Defense counsel stated he believed this evidence could be exculpatory as it established that someone else had motive to set the fire to the Mangroo Apartment and further undermined the prosecution's theory that no one else would have had the motive to set the fire. (*Id.* at 1632.) Counsel asked the court for the opportunity to get evidence of the underlying altercation before the jury, and the court agreed. (*Id.* at 1633-42.) Counsel did not seek a mistrial or adjournment.

---

[4]  Respondent does not raise petitioner's failure to make a constitutional objection to the trial judge before this Court, nor did he raise it on appeal to the Appellate Division. The Court therefore does not address this argument in its analysis.

[5] *People v. Rosario*, 9 N.Y.2d 286 (N.Y. 1961) generally requires the prosecution to provide prior statements of witnesses who will testify at trial.

Both Totaram and Holika testified about the underlying dispute. According to their testimony, the windshield incident occurred at Salima's house around Thanksgiving of 2003. (*Id.* at 1768–69, 1773–74, 1779-80.) An argument occurred outside the home involving Totaram and Intiaz Ishmail's brothers, Samir and Salmo, and some friends of theirs. (*Id.* at 1770, 1776-78.) Totaram testified that he believed one of Samir's friends broke Totaram's rear windshield with a rock. (*Id.* at 1777–79.) The dispute was resolved and Samir paid to have the windshield fixed the next day. (*Id.* at 1781–82.) The family has not since had a dispute with Samir or any other member of the Ishmail family. (*Id.* at 1782.)

### 4. Verdict and Appeals

On March 30, 2006, a jury found petitioner guilty on seven of the eleven counts in the indictment: murder in the second degree (N.Y. Penal Law § 125.25(3)), assault in the first degree (N.Y. Penal Law § 120.10(3)), two counts of arson in the first degree (N.Y. Penal Law § 150.20(1)), arson in the third degree (N.Y. Penal Law § 150.10(1)), stalking in the third degree (N.Y. Penal Law § 120.50), and menacing in the second degree (N.Y. Penal Law § 120.14). (T. 2282–83.) Petitioner was sentenced to an aggregate term of twenty-eight years to life in prison.

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), on five grounds: (1) that the trial court erred by excluding the defense's psychiatric evidence; (2) that the verdict was against the weight of the evidence and based on insufficient evidence; (3) that the trial court erred by refusing to sever the menacing and stalking counts from the rest of the indictment; (4) that the prosecution did not timely disclose exculpatory material;

and (5) that trial counsel rendered ineffective assistance.

On March 17, 2009, the Appellate Division held that the evidence was legally sufficient to support a finding of guilt and that the verdict was not against the weight of the evidence. *People v. Singh*, 875 N.Y.S.2d 553, 554 (App. Div. 2009). The Appellate Division also held that the trial court's refusal to sever the menacing and stalking counts was proper and that the petitioner did not receive ineffective assistance of counsel. *Id.* The Appellate Division summarily concluded that Petitioner's remaining claims were "unpreserved for appellate review and, in any event, are without merit." *Id.*

The New York Court of Appeals denied petitioner's application for leave to appeal on November 12, 2009. *People v. Singh*, 920 N.E.2d 102 (N.Y. 2009).

On January 22, 2008, petitioner filed a motion to set aside his verdict pursuant to N.Y.C.P.L. § 440.10(h) based on the prosecution's failure to provide timely *Brady* material. The County Court of Nassau County denied the motion, concluding that "the defendant has failed to demonstrate the existence of pertinent evidence extraneous to record." *People v. Singh*, Motion Cal. C-057, Indictment No. 1610N-04, at 4 (N.Y. Civ. Ct. Apr. 2, 2008). Further, the court noted that a defendant "who has filed an appeal, may not subsequently seek collateral review of [the] issues, which can be raised on appeal." *Id.* at 6. Petitioner did not appeal this decision.

### 5. Instant Petition

Petitioner filed the instant petition on September 29, 2010, within the one-year statute of limitations provided for in 28 U.S.C. § 2244(d). Respondent filed his

response on December 28, 2010. Petitioner filed a reply on February 9, 2011. The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis,* 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams,* 529 U.S. at 411). The Second Circuit added that, while "some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist,* 260 F.3d at 93 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.'" Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

Petitioner argues that he is entitled to habeas relief on four grounds: (1) the

evidence was insufficient to establish guilt beyond a reasonable doubt; (2) the trial court erroneously excluded evidence of the petitioner's mental capacity; (3) the prosecution failed to disclose potentially exculpatory material in a timely manner; and (4) defense counsel failed to provide effective representation by failing to follow state procedural requirements regarding mental health evidence and failing to move for adjournment or mistrial upon the discovery of withheld exculpatory material. Respondent argues that the second and third claims are procedurally barred from review and that all of petitioner's claims are without merit. The Court agrees with the respondent. The petitioner's second and third grounds are procedurally barred from review by this Court. However, in an abundance of caution, the Court has also analyzed the merits of these claims. Thus, all of petitioner's claims are without merit. Therefore, the Court denies the petition in its entirety on the merits.

## A. Procedural Bar

As a threshold matter, respondent argues that two of petitioner's grounds for habeas relief are procedurally barred from habeas review by this Court. Specifically, the respondent argues that the petitioner failed to preserve the following claims: (1) the trial court's allegedly erroneous exclusion of petitioner's mental health evidence and (2) the allegedly untimely disclosure of potentially exculpatory material. For the reasons set forth below, this Court agrees that these claims are procedurally barred. In addition, even assuming *arguendo* that these claims are not barred from review, they are without merit.

### 1. Legal Standard

A petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261-62 (1989), by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *Id.* at 263 (internal quotation marks omitted). The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks omitted). However, there is a "small category" of "exceptional cases in which [an] exorbitant application of a generally sound [procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002). Nevertheless, "principles of comity . . . counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (quotation marks omitted).

If a claim is procedurally barred, a federal habeas court may not review the claim on the merits unless the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (2) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10 Civ. 3778 (BMC), 2010 WL 5125317, at *3 (E.D.N.Y. Dec. 9, 2010)

(citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" and would require "new reliable evidence . . . that was not presented at trial." *House v. Bell*, 547 U.S. 518, 536-37 (2006).

## 2. Application

### a. Exclusion of Psychiatric Evidence

Petitioner claims that the trial court deprived him of due process and the right to present a defense by precluding him from presenting psychiatric evidence. (Pet. at 8.) The Appellate Division found that this claim was "unpreserved for appellate review and, in any event, [is] without merit." *Singh*, 875 N.Y.S.2d at 554. Respondent argues that, as a result, this Court cannot review petitioner's claim on the merits because it is procedurally barred. Petitioner does not contest that, in dismissing his appeal, the Appellate Division relied on an independent state law procedural ground. Instead, petitioner argues that the Appellate Division relied on a procedural bar that was inadequate because it was: (1) not firmly established and regularly followed, and, (2) was applied in an exorbitant manner to the facts of his case. (Reply at 4.) The Court

finds petitioner's arguments unavailing and addresses them in turn.

New York's preservation doctrine is firmly established and regularly followed. *See Garvey v. Duncan,* 485 F.3d 709, 715-16 (2d Cir. 2007); *Glen v. Bartlett,* 98 F.3d 721, 724-25 (2d Cir. 1996) (finding that failure to preserve issue for appeal was adequate and independent state law ground precluding federal habeas review and further noting that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate ground, even where the state court has also ruled in the alternative on the merits of the federal claim"); *see also Fernandez v. Leonardo,* 931 F.2d 214, 215-16 (2d Cir. 1991); *Green v. Travis,* 414 F.3d 288, 294-95 (2d Cir. 2005) ("[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted," concluding that petitioner's claim was unpreserved.).

Furthermore, the Appellate Division's reliance on the preservation doctrine was not exorbitant in this case. As noted above, in *Lee v. Kemna* the Supreme Court concluded that there is a limited category of "exceptional cases" in which the state appellate court applied a firmly established and regularly followed procedural ground in an "exorbitant" manner so that the application of the ground was inadequate and a federal court was therefore not barred from reviewing that claim on the merits in a habeas appeal. *Lee*, 534 U.S. at 376, 381. Although the Supreme Court did not set forth a test that must be followed to determine whether an application of a procedural ground was exorbitant, the Second Circuit concluded in *Cotto v. Herbert* that there were three factors that could be derived from the Supreme Court's

opinion in *Lee* and should be considered as guideposts in the analysis. 331 F.3d 217, 240 (2d Cir. 2003). These factors include: "(1) whether the alleged violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest." *Id.*

In accordance with the *Cotto* factors, the Appellate Division in the instant case did not apply the preservation doctrine in an exorbitant manner. The Appellate Division implicitly relied on the preservation doctrine set forth in N.Y.C.P.L. § 470.05(2). Essentially, this statute "grants an appellate court the discretion to decline to review claims if they were not preserved by being sufficiently presented to or decided by the trial court."[6] *Ashley v. Burge*, No. 05 Civ. 4497 (JGK), 2006 WL 3327589, at *4 (E.D.N.Y. Nov. 3, 2006); *see also People v. Medina,* 53 N.Y.2d 951, 952 (N.Y. 1981). In the instant case, the Appellate Division did not explicitly state why it believed that petitioner's claim was unpreserved. In their papers, the parties appear in agreement that the Appellate Division's conclusion was based on petitioner's failure to provide

sufficient offer of proof with respect to the psychiatric evidence he sought to present to the jury—the very argument made by respondent to the Appellate Division in his motion papers. As a result, the Court addresses it as the basis for the Appellate Division's conclusion. Petitioner makes two arguments for why psychiatric evidence should not have been excluded based on insufficient offer of proof. First, petitioner asserts that defense counsel made on offer of proof by referring to the competency hearings, specifically referencing the fact that psychiatric evidence was presented that petitioner had an I.Q. of 55 which, according to "more than one doctor . . . was [evidence of] psychiatric debilitation or at least some indication of mental retardation."[7] (Reply at 5; T. at 20.) In the alternative, petitioner argues that an offer of proof was futile because the trial judge "was not interested in an offer of proof at that time." (Reply at 5.) As set forth in detail below, petitioner's arguments are without merit. The *Cotto* factors weigh in favor of upholding the Appellate Division's conclusion that petitioner's claim was not preserved for review because petitioner failed to present a sufficient offer of proof.

The first *Cotto* factor is less relevant in this case because it is unclear whether a proper offer of proof would have altered the trial court's conclusion that evidence of petitioner's mental disease or defect was inadmissible. *See, e.g., Ashley*, 2006 WL 3327589 at *5 (concluding that the first factor was less relevant because "the likely impact of a contemporaneous objection involves a certain degree of speculation" (citing *Cotto*, 331 F.3d at 242-43)).

---

[6] The statute provides, in relevant part, that "[f]or the purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y.C.P.L. § 470.05(2).

---

[7] Petitioner's I.Q. as determined by his expert during the competency hearing was 57. (P.T. 9/2/05 at 276.)

However, assuming *arguendo* that even if this factor favors petitioner's argument, the second and third *Cotto* factors weigh heavily in favor of upholding the Appellate Division's conclusion.

The second *Cotto* factor weighs heavily against petitioner. Compliance with the preservation doctrine is regularly demanded in circumstances similar to those in the instant case. New York courts have consistently held that claims are unpreserved where the defendant failed to make an offer of proof. *See, e.g., People v. Martich*, 818 N.Y.S.2d 48, 49 (App. Div. 2006) ("defendant failed to preserve his argument" where counsel failed to make an offer of proof after court sustained an objection during the cross-examination of a witness by defense counsel); *People v. Rivera*, 721 N.Y.S.2d 54, 55 (App. Div. 2001) ("Defendant's claim that the court improperly precluded him from giving testimony explaining why he had confessed is unpreserved since defendant failed to make an offer of proof after the prosecutor's objections were sustained."); *People v. Rojas*, 683 N.Y.S.2d 515, 516 (App. Div. 1999) ("Since defendant failed to make an offer of proof, his claim that he should have been permitted to elicit from the arresting officer the address defendant gave at the time of his arrest is unpreserved."); *People v. Mejia*, 633 N.Y.S.2d 157, 158 (App. Div. 1995) ("Since defendant made no offer of proof, he failed to make known his position with respect to the court's ruling [barring his expert from giving a particular opinion] at a time when it could have been corrected.").

As noted above, petitioner argues that he did, in fact, make an offer of proof by referring to the competency hearings where it was determined that petitioner had an I.Q. of 55 which was, according to several psychiatrists, "at least some indication of mental retardation." (Reply at 5.) However,

respondent is correct in pointing out that this was an insufficient offer of proof under New York law because it did not indicate the "exact nature" of the evidence defense counsel sought to introduce.[8] (Resp't's Mem. at 15.) Statements about the general nature of possible testimony are insufficient to forestall the application of the preservation doctrine where they do not describe the testimony to be admitted and how the proposed testifying witness arrived at conclusions he would present to the jury. *See, e.g., People v. Lewis*, 562 N.Y.S.2d 47, 48 (App. Div. 1990) ("On appeal, defendant contends that he was deprived of an opportunity to call a material witness to challenge the People's proof as to the depth of the wound. On the basis of the offer of proof, which only claimed that the witness would testify that the wound was not deliberate and did not specify how the witness reached that conclusion, we find this claim to be unpreserved for review as a matter of law."); *People v. Gracius*, 2001 N.Y. Slip Op. 40153U, at *9-10 (N.Y. Civ. Ct. Sept. 21, 2001) ("As a legal gatekeeper, the court must be sufficiently informed of the proposed expert testimony to make a reasoned judgment on the necessity for and competency of the evidence. *People v. Williams*, 614 N.E.2d 730 (N.Y. 1993). An offer of proof ought to summarize the substance or content of the evidence. A sufficient offer of proof . . . would not only

_____

[8] The Court notes that petitioner's trial counsel never indicated to the trial court the psychiatric testimony he actually sought to admit into evidence during trial. In fact, petitioner's I.Q., which allegedly indicated he was mildly retarded, was raised by trial counsel solely in support of his argument that the prosecution had notice that petitioner's mental state was at issue. Essentially, petitioner's trial counsel never elaborated on what psychiatric evidence he actually wanted to be admitted.

inform the People of the nature of the evidence, but permit the court to determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues[,]" concluding that an expert proposed by the defense could not testify at trial that defendant was incapable of forming the intent necessary to be convicted because the expert's report "fails as an offer of proof of reasonably necessary and/or competent expert testimony" on that issue. (quotation marks omitted).[9]

Finally, with respect to the third *Cotto* factor, the petitioner failed to "substantially comply" with the preservation rule and demanding full compliance would serve a legitimate government interest. Petitioner failed to alert the trial court about the exact nature of the psychiatric evidence he sought to introduce, never giving the trial court an opportunity to assess the relevance and admissibility of the psychiatric evidence. Essentially, the trial judge was unable to fully assess whether, despite untimely notice by petitioner's trial counsel, the proposed evidence was relevant and admissible and outweighed any prejudice to the prosecution.

---

[9] Petitioner argues, in the alternative, that an offer of proof would have been futile because the trial judge allegedly indicated that he was not interested in hearing an offer of proof at the time. (Reply at 5.) On appeal to this Court, petitioner argues that the trial court erroneously prevented him from presenting evidence of petitioner's mental disease or defect. The trial judge never indicated that he did not want to hear an offer of proof on this issue. The trial judge's statement that an offer of proof would be heard during trial related to any rebuttal testimony the defense counsel sought to introduce should he believe that the prosecution opened the door to psychiatric evidence.

*See, e.g., Rivera v. Miller*, No. 02 Civ. 6773 LTS GWG, 2003 WL 21321805, at *14 (S.D.N.Y. June 10, 2003) ("Rivera's failure to make an offer of proof or otherwise protest the ruling was actually relied on by the trial court in the sense that the trial court never was given occasion to reconsider its decision to sustain the prosecutor's objection." (quotation marks omitted).); *see also* Section III.B.1.a. Full compliance with the preservation rule is critical so that the trial judge has an opportunity to prevent any reversible error, and New York "has an interest in the finality of criminal trials." *See Ashley*, 2006 WL 3327589 at *5-7.

Notwithstanding petitioner's failure to preserve his claim, this court may still consider it on the merits if petitioner can demonstrate either "cause and prejudice" for the procedural default or that failure to consider the claim will result in a miscarriage of justice, *i.e.*, that he is actually innocent of the crimes for which he was convicted. *See Coleman*, 501 U.S. at 748-51; *Murray*, 477 U.S. at 496. Petitioner has failed to demonstrate cause or prejudice. Petitioner makes no argument for why he had cause to not make a proper offer of proof. To the extent petitioner is suggesting that the procedural default was a result of ineffective assistance of counsel, "[w]here, as here, a petitioner cannot prevail on the merits of his claim[], he cannot overcome a procedural bar by claiming ineffective assistance of counsel." *McLeod*, 2010 WL 5125317, at *4 (citing *Aparcio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) and *Larrea v. Bennett*, 368 F.3d 179, 182 (2d Cir. 2004)); *see also infra* Section III.B.1.a.

Nor has petitioner demonstrated prejudice or that a miscarriage of justice would occur if the Court failed to review his claim on the merits. The exclusion of such evidence did not result in prejudice to the petitioner, *i.e.*, the introduction of such

evidence did not have a reasonable probability of affecting the outcome of the trial. As described in more detail *infra* in section III.B.1.a, the introduction of evidence of petitioner's mild retardation would not have created a reasonable doubt in the jury's mind that the petitioner was guilty. There was overwhelming evidence that the petitioner intentionally stalked and menaced Holika Mangroo and set fire to the Mangroo Apartment and Salima's SUV. Finally, the excluded evidence does not demonstrate that the petitioner was actually innocent of the crimes of which he was convicted, meaning no miscarriage of justice would result from barring the petitioner's claim on procedural grounds.

In sum, the petitioner failed to preserve for appellate review his claim that the trial court erroneously excluded psychiatric evidence. The Appellate Division relied on an independent and adequate procedural bar to dismiss this claim. Furthermore, the petitioner has demonstrated neither cause for the default nor prejudice resulting from such exclusion, nor would a miscarriage of justice result if the Court refused to consider this claim. However, even assuming *arguendo* that the state court erred in finding petitioner defaulted on this claim, the claim is without merit, as discussed *infra* in section III.B.1.a.

### b. Untimely Disclosure of *Brady* Material

Petitioner argues that his conviction should be vacated because of the late disclosure during trial of allegedly exculpatory material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). As with petitioner's evidentiary claim, the Appellate Division found that the petitioner's *Brady* claim was "unpreserved for appellate review and, in any event, [is] without merit." *Singh*, 875 N.Y.S.2d at 554. Respondent argues that this claim is, therefore,

procedurally barred. (Resp's Mem. at 23–25.) The Court agrees.

The alleged *Brady* evidence concerns the identity of "King" within a note handwritten by a Freeport police detective. The note states that, several months prior to the Mangroo Apartment fire, "King" had a dispute with Salima Ishmail's brothers-in-law, Samir and Salmo, that resulted in the breaking of King's windshield. During trial, defense counsel claimed he discovered that "King" was in fact Totaram Mangroo, Holika's brother, who on occasion also lived at the Mangroo Apartment. When defense counsel learned that Totaram was, in fact, "King," he did not move for a mistrial or ask for an adjournment. Instead, counsel only asked to get evidence of the underlying dispute between Totaram/"King" and Salima's brothers-in-law. After extensive colloquy, the trial court granted this request, and counsel was able to examine both Totaram and Holika about the dispute.

Respondent asserts that petitioner's *Brady* claim is procedurally defaulted given that the Appellate Division correctly concluded that it was not preserved because petitioner received all the relief that he requested at trial.[10] Petitioner does not contest either that the Appellate Division dismissed his *Brady* claim on an independent procedural ground or that the

_____

[10] The Appellate Division did not indicate the exact reason why it found petitioner's *Brady* claim to be unpreserved. However, once again the parties appear to be in agreement that the Appellate Division's decision was premised on the fact that petitioner received all the relief he requested from the trial court (the argument respondent made on appeal to the Appellate Division). The Court, therefore, assumes this was in fact the basis for the Appellate Division's conclusion.

preservation doctrine applies to *Brady* claims. Instead, petitioner argues that he was not required to request a mistrial or adjournment of the trial to preserve his claim so that the application of the preservation doctrine was exorbitant in his case. Petitioner's argument is unavailing.

As noted above, this Court must consider the *Cotto* guideposts in its analysis, which indicate that petitioner's *Brady* claim is procedurally barred. The first *Cotto* factor is less applicable to the instant case because it is uncontested that petitioner received all the relief he requested from the trial court and it is unclear whether an adjournment or mistrial would have been granted. However, the second and third *Cotto* factors clearly demonstrate that petitioner's *Brady* claim is procedurally barred. New York courts have consistently held that a defendant must demand from the trial court the relief he requests on appeal. *See, e.g., People v. Thompson*, 863 N.Y.S. 2d 824, 825 (App. Div. 2008) ("To the extent that the defendant asserted that the *Brady* material could have been used to attack the thoroughness of the prosecution's case, that contention was not raised before the trial court and, thus, it is unpreserved for appellate review."); *People v. Monserate*, 682 N.Y.S.2d 25, 26 (App. Div. 1998) ("Defendant's claim that he was prejudiced by eve-of-trial disclosure of *Brady* material is unpreserved because defendant received the precise remedy he requested, to wit, permission to place certain hearsay statements in evidence, and we decline to review his present claim in the interest of justice.")[11] As noted above with respect to

the third *Cotto* factor, there is a legitimate government interest in giving the trial court the first opportunity to address an issue that may result in reversible error and prevents a defendant from getting a second bite at the apple on appeal. *See supra* Section III.A.2.a. As a result, the Appellate Division's conclusion that petitioner's *Brady* claim was procedurally barred was not exorbitant.

Finally, the petitioner cannot show cause and prejudice, or that failure to review this claim would result in a miscarriage of justice.[12] As discussed in more detail in

---

[11] Petitioner cites *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001), for the proposition that bringing a *Brady* violation to the court's attention is all that is required to preserve the claim. In *Leka*, the Second Circuit granted a

new trial to a habeas petitioner due to the untimely disclosure of *Brady* material. *Id.* at 107. In discussing whether the identity of an eyewitness had been in fact suppressed, the court noted that pretrial disclosure solely of the eyewitness's name and address was insufficient. *Id.* at 102 (quoting *Grant v. Alldredge*, 498 F.2d 376, 382 (2d Cir. 1974)). The issue before the *Leka* Court was not whether the petitioner had preserved his *Brady* claim, but rather, whether the relevant material was suppressed. In fact, the district court in *Leka* refused to find petitioner's Brady claim procedurally defaulted due to the state appellate court's ambiguous holding that the claim was "either unpreserved . . . or without merit." *Leka v. Portuondo*, 76 F. Supp. 2d 258, 273 (E.D.N.Y. 1999). Here, the appellate court clearly found the *Brady* claim to be unpreserved (in addition to being without merit), meaning the Second Circuit's language dealing with the merits in *Leka* is inapposite to the question of a procedural bar.

[12] Petitioner asserts that his *Brady* argument is not procedurally defaulted for the additional reason that it is based on off-the-record material—namely, a post-trial affidavit from petitioner's trial counsel—outlining the various tactics trial counsel would have pursued had the Brady material been revealed to him at the appropriate time. (Reply at 11.) Petitioner raised this argument in a N.Y.C.P.L. § 440.10 motion to set aside his verdict. As noted above,

Section III.B.1.b *infra*, earlier disclosure of the allegedly exculpatory material would not have reasonably affected the result at trial so as to prejudice the petitioner. Similarly, the alleged *Brady* material does not demonstrate that the petitioner was actually innocent. At best, the evidence of King's identity merely demonstrates that someone in Holika Mangroo's family had had a dispute with Salima Ishmail's brothers-in-law that was resolved months before the fatal fire that took Salima's life. The mere fact that someone else might have had a (tenuous) motive to set fire to the Mangroo Apartment and Salima's SUV falls far short of demonstrating actual innocence.

For the reasons set forth above, the Court concludes that the Appellate Division's conclusion that petitioner's *Brady* claim was not preserved was neither contrary to, nor an unreasonable application of, clearly established federal law. However, even assuming *arguendo* there was no procedural default, petitioner's claim is nevertheless without merit, as addressed below.

---

the County Court of Nassau County denied petitioner's Section 440.10 motion because petitioner "failed to demonstrate the existence of pertinent evidence extraneous to record." *Singh*, Motion Cal. C-057, Indictment No. 1610N-04, at 4. As an initial matter, petitioner never appealed the denial of his Section 440.10 motion to the Appellate Division. In any event, the Court has reviewed trial counsel's affidavit (which was relied on in petitioner's reply brief to the Court) indicating that he would have changed his strategy had he known of the *Brady* material earlier. However, this affidavit does not affect this Court's analysis and conclusion that the *Brady* material was not suppressed and, in any event, was not material. *See infra* Section III.B.1.b.

## B. Merits

Petitioner argues that he is entitled to habeas relief based on the trial judge's erroneous exclusion of psychiatric evidence, the prosecution's untimely disclosure of *Brady* material, insufficiency of the evidence, and ineffective assistance of counsel. As already noted, the erroneous exclusion of psychiatric evidence and *Brady* claims are procedurally barred. In addition, for the reasons below, all four grounds are without merit. Accordingly, the petition is denied in its entirety.

### 1. "Procedurally Barred" Claims

Even assuming *arguendo* that the Court could review petitioner's claims that the trial court erroneously excluded psychiatric evidence and that petitioner was prejudiced by the untimely disclosure of *Brady* materials, the Court finds these claims to be without merit.

#### a. Psychiatric Evidence

Petitioner argues that the trial court's exclusion of psychiatric evidence violated his Sixth and Fourteenth Amendment rights to present witnesses in his own defense. (Reply at 6.) Due to petitioner's failure to follow the statutory notice provisions relating to psychiatric evidence, the trial court precluded the petitioner from introducing evidence of his mental disease or defect at trial unless the prosecution "opened the door" to such evidence, at which time an offer of proof would be required from the defense. As set forth below, the inclusion of this evidence at petitioner's trial would not have created a reasonable doubt in the jury's mind that did not otherwise exist, so that the Appellate Division's conclusion that this claim was without merit was neither contrary to, nor based on an unreasonable application of,

clearly established federal law. Therefore, petitioner's claim is denied.

It is well-established that "[t]he right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). However, this right is not without limitation; rather, it is subject to "reasonable restrictions" including "state and federal rules of procedure and evidence 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

Whether a habeas petitioner's right to present evidence has been violated depends on whether or not the trial court's application of the state evidentiary rule was erroneous. *See Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (explaining that "habeas corpus relief does not lie for errors of state law, and that necessarily includes erroneous evidentiary rulings[,]" but that "[t]he inquiry into possible state evidentiary law errors at the trial level assists us in ascertain[ing] whether the appellate division acted within the limits of what is objectively reasonable." (quotation marks and citations omitted)). If the trial court's application was proper, then the habeas court's inquiry is limited to "whether the evidentiary rule is arbitrary or disproportionate to the purposes [it is] designed to serve." *Id.* (quotation marks omitted) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)); *see also Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) ("[T]he Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote . . . ."). If the trial court's evidentiary ruling was erroneous under state law, the habeas court looks at "whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke*, 90 F.3d 43, 47, 50 (2d Cir. 1996) (revisions in original) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *see also Wade*, 333 F.3d at 59 (stating that same standard still applies post-AEDPA).

The Court agrees with the Appellate Division's conclusion that the trial judge did not err in applying the notice rule to defense counsel's request to present psychiatric evidence. The decision of whether to allow delayed notice under N.Y.C.P.L. § 250.10 is left to the discretion of the trial judge, subject to close scrutiny due to constitutional concerns. *See People v. Berk*, 88 N.Y.2d 257, 266 (N.Y. 1996) ("The trial court's discretion in this matter, however, is not absolute. Exclusion of relevant and probative testimony as a sanction for a defendant's failure to comply with a statutory notice requirement implicates a defendant's constitutional right to present witnesses in his own defense."). In the instant case, defense counsel failed to follow the clear written notice requirements set out in § 250.10 and failed to articulate good

cause justifying late notice.[13] To the extent petitioner argues that the competency hearings held before trial served in lieu of notice that petitioner's psychiatric state would be an issue at trial, that argument is unavailing. A reference to the competency hearing, at which the court concluded that petitioner was competent to stand trial, was insufficient cause for the delay in serving notice to overcome the prejudice to the prosecution in having petitioner request to submit psychiatric evidence on the day trial was to commence.[14] *Cf. Ronson v. Comm'r of Corr.*, 604 F.2d 176, 179 (2d Cir. 1979) (A pre-AEDPA decision in which the court concluded that "[w]hile Ronson's counsel Anolik never filed a formal notice of intention to raise the insanity defense, it is clear that he did not intend or attempt to hide the issue from the state or the court. In fact, he gave actual notice in all but precise form . . . [by] fil[ing] a copy of Dr. Abrahamsen's report with the calendar judge soon after the psychiatric examination was conducted. He also gave permission for the report to be released to the state before trial." Furthermore, the defendant moved to call the same doctor as a witness in his first trial and after a mistrial, "Anolik wrote to the district attorney's office reserving the right to raise an insanity defense at any future trial."); *People v. Gracius*, 774 N.Y.S.2d 534, 535-36 (App. Div. 2004) (the prosecution was not prejudiced by late notice where: (1) after the first competency hearing, defendant was found unfit to stand trial; (2) after the second competency hearing, where defendant was found fit to stand trial, defense counsel notified the prosecution about a month before trial that he intended to proffer psychiatric evidence; (3) where defense counsel maintained that the delayed notice was due to "law office failure"; and (4) where defense counsel filed a subsequent notice, including a psychiatrist's evaluation); *People v. Burton*, 549 N.Y.S.2d 242, 243 (App. Div. 1989) (although notice was late, defendant: (1) demonstrated good cause where the "importance of the psychiatric defense is apparent from the testimony of defendant's sister and niece," and from the report of a psychiatrist; and (2) the prosecution was not prejudiced where notice was approximately two months late and where the defendant was not greatly advantaged by having his expert evaluate the defendant at a time much closer to the alleged crime).

Where, as here, the trial court's application of § 250.10 was proper as a matter of state law, the petitioner must establish that the rule is "arbitrary" or "disproportionate to the purposes [it is] designed to serve." *Scheffer*, 523 U.S. at 308. "A state evidentiary rule is 'unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.'" *Hawkins*, 460 F.3d at 244 (quoting *Scheffer*, 523 U.S. at 308). Absent special circumstances, § 250.10's notice requirement has been upheld as a constitutional restriction on the right to present evidence. *See Almonor v. Keane*, 27 F. App'x 10, 12 (2d Cir. 2001) (denying habeas relief for trial court's preclusion of evidence under § 250.10); *Bien v. Smith*, 546 F. Supp. 2d 26, 45–46 (E.D.N.Y. 2008)

[13] The Court notes that during his bench ruling on petitioner's competency to stand trial, the trial judge specifically indicated that "Article 250 does not apply to this 730.30 hearing, [but that] it applies to psychiatric evidence used after and during the trial." (P.T. 12/12/2005 at 84.) Thus, petitioner's trial counsel was aware that Article 250, including its notice requirement, would be applicable to psychiatric evidence.

[14] Furthermore, and as noted above, it is unclear exactly what psychiatric evidence petitioner sought to introduce at trial and via whom.

(same); *Rios v. Artuz*, No. 07-CV-330 (NGG), 2007 WL 1958899 at *5-6 (E.D.N.Y. June 29, 2007) (same). The purpose of § 250.10's notice requirement is "to allow the prosecution an opportunity to acquire relevant information . . . to counter the defense," as well as to "promote[] fairness" and "avoid[] delay." *Berk*, 88 N.Y.2d at 264–65. All of these interests were implicated in the instant case. By failing to give the required notice, petitioner placed the prosecution at a substantial disadvantage essentially the day jury selection was to commence. The prosecution had no notice as to the exact nature of the psychiatric evidence the petitioner sought to introduce or the manner in which this evidence would be introduced. Absent the application of the notice rule to bar petitioner from presenting evidence of his mental disease or defect, the prosecution would have been faced with a choice of either delaying the trial or going to trial with no real knowledge of what kind of psychiatric evidence the petitioner would introduce. Given the clear violation of the notice requirement, petitioner's failure to show good cause for the failure, and, as discussed in detail below, the limited probative value of the proffered testimony, application of the rule here did not infringe upon a "weighty interest" of the petitioner, *see infra*, meaning preclusion was neither arbitrary nor disproportionate to the purpose of preventing surprise or prejudice to the prosecution.

Even assuming *arguendo* that the exclusion of such evidence was improper under state law, the error did not deprive petitioner of a fundamentally fair trial. Petitioner argues that evidence of his "IQ of 55, rigid thought patterns and inability to weigh possibilities" would have cast doubt on his guilt. (Reply at 9.) Although the record is unclear on exactly how the petitioner would have used this evidence at trial,[15] no permissible use of the evidence would have created a reasonable doubt of guilt given the record as a whole.

To the extent that the psychiatric evidence would have been used to show that petitioner lacked the motive or planning ability to harass Holika and plan and set fire to the Mangroo Apartment and Salima's SUV, the introduction of such evidence would not have created a reasonable doubt as to his guilt. As noted in more detail *infra*, the record demonstrates overwhelming evidence to support the entire verdict beyond a reasonable doubt. The introduction of evidence that the petitioner was mildly retarded would have done little (if anything) to rebut the weighty evidence against him. The jury heard uncontroverted evidence that the petitioner violently stalked and harassed Holika Mangroo during the months leading up to the fires. The jury heard uncontroverted evidence that petitioner knew Holika used Salima's SUV and a car matching the description of petitioner's vehicle was seen leaving the scene of the SUV fire. Additionally, the jury heard uncontroverted evidence that the petitioner borrowed a gas can from his employer the afternoon prior to the apartment fire. The jury also heard evidence that gasoline was found on the petitioner's clothes at the time he was arrested.

_____

[15] It is unclear if the petitioner would have used psychiatric evidence to argue that he did not actually engage in conduct he was convicted of (in being incapable of forming a prolonged motive to carry it out), (Pet. at 8; T. at 20, 35), or if he would have argued that he could not *intentionally* commit the charged crimes, *i.e.*, that he lacked the culpable state of mind necessary to be convicted (Reply at 9). The trial judge believed petitioner was making the latter argument. (T. at 37.) In any event, the court will address both arguments.

Furthermore, the jury heard evidence that petitioner's car trunk liner was missing at the time of his arrest and that a trunk liner the same color as petitioner's was found stuffed inside a truck owned by petitioner's employer. Similarly, the jury heard testimony that a car carrying an individual with the same deformity as petitioner has on his index finger was seen crossing the Whitestone Bridge to and from the Bronx around the time of the Mangroo Apartment fire. Given this overwhelming evidence that petitioner actually engaged in the criminal conduct he was accused of, the introduction of the psychiatric evidence would not have created a reasonable doubt in the jury's mind that the petitioner committed the conduct.

To the extent that petitioner would have used the psychiatric evidence to argue that he lacked *mens rea* necessary for each of the crimes he was convicted of, his claim is similarly without merit. At the outset, the Court notes that petitioner had no absolute federal constitutional right to present psychiatric evidence on the question of *mens rea*. *See Clark v. Arizona*, 548 U.S. 735, 770-71 (2006) (finding that Arizona rule precluding use of psychiatric evidence to rebut *mens rea* did not violate due process). However, under New York law, a criminal defendant may, subject to relevant evidentiary rules, present evidence of a mental defect to negate the "specific intent" necessary to establish guilt. *People v. Segal*, 54 N.Y.2d 58, 66 (N.Y. 1981) ("Although proof of a mental defect other than insanity may not have acquired the status of a statutory defense, and will not constitute a 'complete' defense in the sense that it would relieve the defendant of responsibility for all his acts[,] it may in a particular case negate a specific intent necessary to establish guilt." (internal citations omitted)). Unlike an affirmative defense (which a defendant has the burden to prove by preponderance of the evidence), evidence that the petitioner possessed specific intent must be established by the prosecution through proof beyond a reasonable doubt. *See People v. Almonor*, 93 N.Y.2d 571, 580 (N.Y. 1999) ("A *mens rea*-type defense, by contrast [to an affirmative insanity defense], serves to negate a specific intent necessary to establish guilt."); *People v. Matthews*, 544 N.Y.S.2d 398, 403 (App. Div. 1989) (reversing conviction on grounds that trial court had impermissibly shifted burden of proof to defendant by elevating *mens rea* defense into an affirmative defense). Mental retardation has been recognized as a mental defect that may negate specific intent. *See People v. Wilcox*, 599 N.Y.S.2d 131, 132 (App. Div. 1993) (overturning conviction for trial court's failure to instruct jury that it could consider evidence of defendant's mild mental retardation on the question of intent to commit homicide).

The Court looks to New York law to determine the specific intent necessary for each of the petitioner's convictions. Petitioner was convicted of second degree murder (felony murder), first degree assault (felony assault), first and third degree arson, third degree stalking, and second degree menacing. The first degree arson charge required a finding that petitioner intended to cause a fire to a building when he knew there was a "reasonable possibility" that the building was occupied. *See* N.Y. Penal Law § 150.20(1). The petitioner's convictions for felony murder and felony assault *did not* require the jury to find a specific intent to kill or assault; they merely required a finding that the petitioner committed the predicate felony, *i.e.* first-degree arson. *See id.* § 125.25(3) (felony murder); *id.* § 120.10(4) (felony assault). The third degree arson required a finding that petitioner intended to damage a motor vehicle by starting a fire. *Id.* § 150.10(1). The menacing charge required a finding that

petitioner intended to place Holika "in reasonable fear of physical injury, serious physical injury or death[,]" while the stalking charge required an intent to "harass, annoy or alarm" her. *Id.* § 120.14(1) (menacing); *id.* § 120.50(3) (stalking).

The introduction of psychiatric evidence would not have created a reasonable doubt about the petitioner's ability to form the requisite specific intent for any of the crimes of which he was convicted.[16] The jury heard uncontroverted evidence that the petitioner was able to drive a vehicle and was capable of maintaining and servicing trucks for his employer. The jury also heard evidence that the petitioner was able to have a romantic relationship with Holika Mangroo and that petitioner obtained a gas can from his employer hours prior to the apartment fire. In light of the strong evidence of petitioner's capabilities and conduct leading up to the Mangroo Apartment fire, the introduction of evidence that petitioner had an "IQ of 55,

rigid thought patterns and inability to weigh possibilities" (Reply at 9), would not have created a reasonable doubt that petitioner possessed the specific intent necessary to support his convictions. Habeas courts reviewing ineffective assistance of counsel claims have reached similar conclusions regarding prejudice resulting from trial counsel's failure to introduce or effectively use psychiatric evidence to rebut a showing of intent.[17] *See Wright v. Ayers*, 271 F. App'x 597, 598 (9th Cir. 2008) (finding that trial counsel's failure to present evidence that habeas petitioner was schizophrenic and mentally retarded in order to rebut specific intent did not prejudice petitioner in light of "overwhelming evidence" of intent where defendant "shot the victim in the leg, attempted to shoot the victim in the torso, and repeatedly attempted to shoot the victim's brother in the rib cage"); *Remy v. Graham*, No. 06-CV-3637 (JG), 2007 WL 496442, at *7 (E.D.N.Y. Feb. 12, 2007) (finding that counsel's failure to introduce

---

[16] The petitioner points to the fact that he was acquitted on two of the three murder counts (the intentional murder and "depraved indifference" murder charges) in the indictment as evidence that the jury had doubts about the defendant's capacity to commit the crimes he was accused of. (Reply at 10.) This argument is without merit. The fact that the jury had reasonable doubts about whether the defendant intended to kill or acted with depraved indifference does not undermine the jury's conclusion that the petitioner intended to harass and menace Holika, set fire to the Ishmail SUV, and set the Mangroo Apartment fire underlying his felony murder conviction. These verdicts are entirely consistent, and the acquittals do not cast doubt on the convictions. The Court's analysis consequently focuses on whether there would have been a reasonable doubt created about the defendant's ability to commit the crimes he was convicted of had the evidence of petitioner's mild retardation been admitted.

[17] While these courts were dealing with ineffective assistance of counsel claims, the standard for determining materiality under an ineffective assistance claim is substantially similar to the standard for determining materiality resulting from an evidentiary error. *Compare Strickland v. Washington,* 466 U.S. 688, 694 (1984) ("[T]he appropriate test for prejudice [from ineffective assistance of counsel] finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution . . . ." (citing *Agurs*, 427 U.S. at 104, 112–13)) *with Justice*, 90 F.3d at 47 (adopting *Agurs* test of materiality for claims of prejudice resulting from erroneous exclusion of defense evidence); *see also McKitchen v. Brown*, 565 F. Supp. 2d 440, 465 n.29 (E.D.N.Y. 2008) (noting that the materiality standards for ineffective assistance of counsel and for evidentiary errors are essentially the same standard), *rev'd on other grounds*, 626 F.3d 143 (2d Cir. 2010).

evidence of Post-Traumatic Stress Disorder did not prejudice habeas petitioner because introduction of such evidence would not have created a reasonable doubt regarding the petitioner's mental state where "the extreme violence and difficulty of Remy's final assault-the severing of part of an officer's ear with his teeth-could very well cause a jury to conclude that the act was necessarily done with specific intent and not the result of a mere temporary loss of control").

Petitioner relies on *Pulinario v. Goord*, 118 F. App'x 554 (2d Cir. 2004), and *Ronson v. Commissioner*, 604 F.2d 176 (2d Cir. 1979), to support his claim that the trial court's application of § 250.10 violated his Sixth Amendment rights. (Reply at 6–7.) Both decisions are distinguishable from this case. In *Pulinario*, the trial court precluded a homicide defendant from presenting psychiatric evidence of Post-Traumatic Stress Disorder and Rape Trauma Syndrome as an affirmative defense. 118 F. App'x at 556. The trial court's decision was based on N.Y.C.P.L. § 250.10(5), which allows a court to exclude psychiatric evidence when a defendant "willfully" fails to cooperate with a court-ordered examination. The Second Circuit ruled that this preclusion was unconstitutional. *Pulinario*, 118 F. App'x at 558. However, in doing so, the Court relied primarily on the unique circumstances of the case; specifically, the prosecution did not move for preclusion until after the defendant had testified and "inculpated herself in the charged homicide in order to lay the necessary foundation for her psychiatric expert." *Id.* Unlike *Pulinario*, petitioner's trial did not involve luring the petitioner into inculpating himself or other tactical chicanery on the part of the prosecution. Instead, the petitioner failed, without good cause, to follow a clearly established evidentiary requirement, and the prosecution sought preclusion immediately upon learning that the petitioner may seek to introduce psychiatric evidence.

Petitioner also relies on *Ronson* to argue that the trial court's preclusion of his psychiatric evidence under § 250.10 was unconstitutional. In *Ronson*, the trial court prevented a murder defendant from presenting a complete insanity defense due to counsel's failure to follow § 250.10's notice requirements. 604 F.2d at 178. The Second Circuit found this to be unconstitutional because defense counsel's "substantial compliance" with § 250.10 had eliminated any prejudice or surprise to the government; specifically, counsel had provided the state with a psychiatric report, moved in the first trial to call a psychiatrist, and sent a letter to the prosecutor following an earlier mistrial raising the possibility of raising a complete insanity defense. *Id.* at 178-79. *Ronson* is inapposite here. Contrary to petitioner's argument, the pretrial competency hearings did not put the state "on notice" that evidence of Singh's retardation would be an issue at trial. Rather, the competency hearings were only intended to determine if the petitioner possessed the mental capacity to stand trial, not whether the petitioner was not guilty due to a mental defect existing at the time of the alleged crimes. *See Westchester Rockland Newspapers, Inc. v. Leggett*, 48 N.Y.2d 430, 441 (N.Y. 1979) ("'Determinations of incompetency to stand trial, lack of criminal responsibility because of mental disease or defect, and mental illness for purposes of civil commitment are independent concepts.'" (quoting Robert M. Pitler, *New York Criminal Practice Under the CPL*, at 330); *People v. Severance*, 708 N.Y.S.2d 258, 260 (N.Y. Civ. Ct. 2000) (noting that competency hearing "is not a determination of mental illness, and is also completely unrelated to issues associated with the insanity defense and its concern with the

defendant's mental capacity at the time of commission of the crime")))

In sum, the Appellate Division's conclusion that petitioner's evidentiary claim was without merit is neither contrary to nor based on an unreasonable application of clearly established federal law. In addition to being procedurally barred, this claim is meritless because, when viewing the record as a whole, the introduction of evidence demonstrating that petitioner was mildly mentally retarded would not have created a reasonable doubt in the jury's mind that did not otherwise exist, in light of the overwhelming evidence of his mental state and his guilt. Therefore, habeas relief on this ground is denied.

b. Untimely Disclosure of *Brady* Material

Petitioner argues that the prosecution's failure to disclose evidence showing that Salima Ishmail's brothers-in-law had had a dispute with her brother Totaram Mangroo was a violation of the government's duty to disclose potentially exculpatory evidence, as established by *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner claims that this evidence establishes that someone else—specifically, Totaram Mangroo—might have had a motive to set fire to Salima's SUV and her apartment, contrary to the prosecution's theory that no one else had a motive. (Reply at 13.) Because this evidence was neither suppressed nor material, petitioner's *Brady* claim is without merit.

Under *Brady*, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prevail on a *Brady* claim, petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *See Kyles v. Whitley,* 514 U.S. 419, 437-38 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene,* 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)). Failure to disclose such material evidence merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" *Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678). Furthermore, "[t]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281.

As the Second Circuit has explained, "[w]ith respect to *when* the prosecution must make a disclosure required by *Brady,* the law also appears to be settled. *Brady* material must be disclosed in time for its effective use at trial." *United States v. Coppa,* 267 F.3d 132, 135 (2d Cir. 2001) (emphasis in original). Therefore, "*Brady* material that is not 'disclos[ed] in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the *Brady* doctrine." *United States v. Douglas,* 525 F.3d 225, 245 (2d Cir. 2008) (quoting *Leka v. Portuondo,* 257 F.3d 89, 103 (2d Cir. 2001)). On the other hand, if the defense receives the information from the government in time for its effective use at trial by the defense, then the information has not been "suppressed" within the meaning of *Brady* regardless of whether the disclosure was made immediately before trial or even during the trial. *Id.* at 245-46 (finding government's disclosure of documents one business day

before trial did not constitute "suppression" within the meaning of *Brady* because defense counsel had sufficient time to make effective use of documents).

With respect to the issue of "effective use," the Second Circuit has emphasized that there are situations where the receipt of exculpatory information immediately prior to trial, or during the trial, will not provide the defense with sufficient time to fully and effectively develop and use the information. For example, in *Leka v. Portuondo,* the Second Circuit explained:

> The limited *Brady* material disclosed to [the defendant] could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case. *See United States v. Cobb,* 271 F. Supp. 159, 163 (S.D.N.Y. 1967) (Mansfield, J.) ("There may be instances where disclosure of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled and presented.").

257 F.3d at 101; *accord Watson v. Greene,* No. 06 CV 2212 (CBA), 2009 WL 5172874, at *31 (E.D.N.Y. Dec. 30, 2009) ("Although pretrial disclosure is not mandated in all circumstances . . . , favorable evidence that has a material bearing on defense preparation must be disclosed prior to trial if further development by defense counsel would be necessary in order to put it to effective use." (internal quotation marks and citations omitted)), *rev'd on other grounds,* ---F.2d----, 2011 WL 1843513 (2d Cir. 2011). Thus, the late disclosure of exculpatory evidence is fraught with great danger of prejudice to the defendant, and a court must carefully scrutinize any such situation to ensure that, despite the fact that information was disclosed on the eve of trial or during the trial, the defense was able to effectively use the information.

Petitioner has failed to establish either suppression or materiality. First, the evidence at issue—King's identity and the underlying windshield incident—was not "suppressed" for purposes of *Brady*. Instead, the petitioner was able to make effective use of such evidence at trial. Defense counsel was able to elicit, on cross-examination of Totaram and Holika Mangroo, the details of the dispute between Totaram and Salima's brothers-in-law. The disclosure came before the government had rested, meaning that the petitioner would have had the opportunity to call and subpoena any additional witnesses—including the brothers-in-law themselves—if he so desired. No further development, other than that already afforded to the defense, was necessary to allow the petitioner to make effective use of evidence at trial.

Nevertheless, petitioner argues that earlier disclosure of King's identity would have allowed pretrial investigation of the dispute between Totaram and Salima's brothers-in-law.[18] (Reply at 13.) Petitioner

_____

[18] The Court notes that there is evidence that defense counsel already knew the identity of

places particular reliance on the fact that he was only able to cross-examine Totaram and Holika after they had consulted with the prosecutor. However, neither *Brady*, nor any other decision the Court is aware of, requires defense counsel priority access to witnesses. Moreover, there is no evidence that earlier access would have resulted in more favorable evidence for petitioner. Furthermore, petitioner argues that pretrial disclosure would have afforded him the opportunity to locate and interview additional witnesses. (*Id.*) However, trial counsel had the opportunity, at the least, to ask for an adjournment to so allow him to investigate, an option he failed to exercise. Not only does this waiver procedurally bar petitioner's *Brady* claim, as discussed *supra*, but it also undermines the petitioner's suppression argument. Finally, petitioner argues that had he known about the windshield incident earlier, he would have changed his trial tactics and cross-examined police detectives on their failure to follow up investigating Totaram as a potential suspect. (*Id.* at 13–14.) However, had defense counsel so desired, he could have attempted to recall these witnesses in light of the late disclosure; he made no such request at trial.

Even assuming *arguendo* that King's identity was suppressed, the Court cannot conclude that there was a reasonable probability that such evidence would have changed the result at trial. Petitioner argues that evidence of the windshield incident would have undercut the prosecution's theory that no one else had the motive to set the SUV and Mangroo apartment fires. (*Id.* at 12–13.) Specifically, such evidence would have allegedly allowed petitioner to show that Totaram, and not the petitioner, might have set the fires. (*Id.* at 13.) The respondent counters that earlier disclosure would not have allowed the petitioner to convince the jury that a dispute involving a broken windshield in November of 2003, for which Totaram was reimbursed, eventually escalated into an SUV fire in June of 2004 and a deadly apartment fire in July of 2004. (Resp't's Mem. at 28.) Respondent also argues that it is highly unlikely that Totaram's supposed animus toward the Ishmail family would lead him to put his own family at risk by setting fire to an apartment he had used and where his mother and his sister were sleeping. (*Id.* at 28–29.) The Court agrees with respondent that there is no reasonable probability that the jury would have accepted petitioner's argument that Totaram had a motive to set the fires in light of the evidence presented at trial. In fact, as noted *supra*, the jury did hear evidence of this dispute through cross-examination of the prosecution's witnesses. However, even assuming the jury believed that there were other people with a motive to commit these crimes, the evidence of such alternative suspects does nothing to counter the uncontested testimony that (1) Singh harassed and confronted Holika during the months leading up to SUV and apartment fires, (2) Singh knew that Holika used Salima's SUV and a vehicle matching the description of petitioner's car was seen leaving the scene of the SUV fire, (3) Singh borrowed a can of gasoline from his employer the evening before the apartment fire, (4) Singh's car was on Long Island at the time of the fire, (5) Singh's clothes contained traces of gasoline at the time of

---

"King" and had knowledge of the underlying dispute before trial. For example, counsel stated to the trial judge that he had "always" had "firsthand knowledge" of the windshield incident. (T. 1765.) Furthermore, respondent argues that minimal investigation would have revealed King's identity, given that "King" was the brother of the petitioner's ex-fiancée. (Resp't's Mem. at 27.)

his arrest, and (6) the trunk liner from Singh's car was removed and hidden. The fact that other people may have had a dispute with a member of Holika's family does little to cast any doubt on the inference of guilt beyond a reasonable doubt that the jury undeniably drew from this testimony. Thus, there is no reasonable probability that earlier disclosure of King's identity and the underlying dispute would have changed the outcome.

In short, the Appellate Division's conclusion that petitioner's *Brady* claim was without merit is neither contrary to, nor based on an unreasonable application of, clearly established federal law.

### 2. Insufficient Evidence

In addition to the procedurally barred claims discussed above, the petitioner claims that the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt. However, viewing the evidence in the light most favorable to the prosecution, a rational jury could have found guilt beyond a reasonable doubt. Therefore, the Appellate Division's finding that the evidence was sufficient was not contrary to, or based on an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record. Thus, habeas relief on this claim is denied.

### a. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Einaugler v. Sup. Ct. of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir.

1997). A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also Policano v. Herbert,* 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson,* 443 U.S. at 324)); *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir. 1993) (internal quotation marks omitted) (quoting *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir. 1984)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson,* 443 U.S. at 326).

A habeas petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

*Flowers v. Fisher,* 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson,* 433 U.S. at 324). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999).

### b. Application

On direct appeal, the Appellate Division found that, "[v]iewing the evidence in the light most favorable to the prosecution, . . . it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Singh,* at 554 (citation omitted). Although the appellate court relied on state law to adjudicate this claim, the AEDPA deferential standard of review still applies. *See Sellan v. Kuhlman,* 261 F.3d 303, 311–12 (2d Cir. 2001). The appellate court's resolution of this issue was neither contrary to nor involved an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record.

The prosecution presented evidence from which a rational juror could conclude beyond a reasonable doubt that the petitioner was guilty of the crimes charged. Jurors heard evidence that petitioner was on Long Island at the time of the fire, and heard testimony that the petitioner borrowed a gas can from his employer the evening before the fire. A fire investigator testified that the fire was the result of arson and that gasoline was used as an accelerant. The prosecution also presented evidence that traces of gasoline were found on petitioner's clothes at the time of his arrest. The jury also heard testimony that a trunk liner the same color as the one from petitioner's car was found on the day of the Mangroo Apartment fire stuffed inside the compressor compartment of a flatbed owned by the petitioner's employer. This evidence, as well as the other evidence of motive outlined below, could have led a rational juror to conclude beyond a reasonable doubt that Singh had the means and opportunity to commit the crimes he was convicted of arising out of the apartment fire: second-degree murder,[19] first-degree assault,[20] and first-degree arson.[21]

Finally, jurors heard uncontroverted testimony from Holika Mangroo that the defendant harassed her over a period of several months. This conduct included threats of violence, including threatening Holika with a gun and forcing her to come with him. This testimony was sufficient to allow a rational jury to conclude, beyond a reasonable doubt, that the petitioner had in fact stalked[22] and menaced[23] Holika. This

---

[19] The second-degree murder charge only required the jury to find beyond a reasonable that the petitioner "cause[d] the death of a person" while "commit[ting] or attempt[ing] to commit . . . arson . . . ." N.Y. Penal Law § 125.25(3).

[20] The first-degree assault charge required the jury to find beyond a reasonable that the petitioner, "[i]n the course of and in furtherance of the commission or attempted commission of a felony . . . cause[d] serious physical injury to a person other than one of the participants." N.Y. Penal Law § 120.10(4).

[21] The first-degree arson charge required the jury to find beyond a reasonable doubt that the petitioner "intentionally damage[d] a building . . . by causing . . . a fire" that "cause[d] serious physical injury to another person" and that the petitioner knew of facts or circumstances making it a "reasonable possibility" that a person was in the building at the time. N.Y. Penal Law § 150.20(1).

[22] The third-degree stalking charge against the petitioner required the jury to find beyond a

evidence of harassment, combined with the evidence of a car similar to petitioner's fleeing the scene of the SUV fire, could have led a rational jury to conclude that the petitioner was guilty beyond a reasonable doubt of third-degree arson[24] in connection with that fire.

Petitioner—relying on *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), and *United States v. Yoakam*, 116 F.3d 1346 (10th Cir. 1997)—claims that here, as in those cases, the evidence is insufficient to support his conviction because it is primarily circumstantial. (Reply at 3.) As discussed below, these cases are not probative here.

The evidence in those cases was much more circumstantial than the evidence presented here. In *Glenn*, the government put forward the theory that the defendant killed the victim due to the victim not giving the defendant his share of a drug deal. 116 F.3d at 65. However, the government failed to establish either any agreement between the victim and the defendant to share any profits or any disagreement arising between them. *Id.* The evidence that the defendant had the opportunity to kill the victim was merely that the victim and the defendant had met sometime before the murder, even though such meetings were fairly common. *Id.* at 66. The evidence that the defendant possessed a handgun shortly after the shooting consisted solely of a lay opinion from another drug dealer that the defendant's jacket had a bulge in it and that this bulge was likely a handgun. *Id.* at 66. The government also relied on questionable evidence of the defendant's flight from the area near the shooting, indicating that the defendant requested a ride he was not engaging in suspicious conduct like running or asking to be taken to a remote location. *Id.* at 67–68. Finally, the government relied on false statements by the defendant to police as evidence of consciousness of guilt. *Id.* at 69. Viewing the record as a whole, the Second Circuit found this evidence insufficient to support guilt. *Id.* at 70. In *Yoakam*, an arson and fraud case, the government's theory was that the government set fire to a business in which he owned a minority share in order to avoid being required to acquire the whole business at an unfavorable price. 116 F.3d at 1348. Outside of circumstantial evidence that the defendant was having financial difficulties, the only evidence linking the defendant to the fire was the fact that he was the last person out of the building on the day of the fire. *Id.* at 1350.

Unlike in *Yoakam* and *Glenn*, the evidence against Singh is far more compelling. The *direct* evidence of his stalking and menacing was uncontroverted; Holika Mangroo testified that the petitioner harassed and threatened her on several occasions over the course of several months, including at one point showing her his gun and threatening to use it on her. This

---

reasonable doubt that, "[w]ith intent to harass, annoy or alarm a specific person, [the petitioner] intentionally engage[d] in a course of conduct directed at such person which [was] likely to cause such person to reasonably fear physical injury or serious physical injury . . . ." N.Y. Penal Law § 120.50(3).

[23] The second-degree menacing charge required the jury to find beyond a reasonable doubt that the petitioner "intentionally place[d] or attempt[ed] to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon . . . ." N.Y. Penal Law § 120.14(1).

[24] The third-degree arson charge required the jury to find beyond a reasonable doubt that the petitioner "intentionally damage[d] a . . . motor vehicle by starting a fire . . . ." N.Y. Penal Law § 150.10(1).

evidence of prior conduct and eyewitness testimony that a car matching petitioner's fled the scene of the SUV fire was sufficient for a juror to conclude beyond a reasonable doubt that petitioner set fire to the SUV. Furthermore, jurors could reasonably conclude from the evidence that petitioner borrowed a gasoline can shortly before the apartment fire, petitioner was on Long Island at the time of the fire, petitioner fled Long Island shortly after the fire was set, the petitioner had gasoline on his clothes the afternoon after the fire, and that the petitioner attempted to dispose of the trunk liner of his car (the same trunk he placed the gas can in) by hiding it in the compressor compartment of a company vehicle. In short, the evidence presented at trial could lead a rational juror to conclude guilt beyond a reasonable doubt on all the charges petitioner was convicted of.

Moreover, neither *Glenn* nor *Yoakam* stand for any categorical rule that circumstantial evidence is not sufficient to support a guilty verdict. On the contrary, *Glenn* recognizes the well-established axiom that "[c]ircumstantial evidence can be as compelling as direct evidence and a conviction can rest solely on circumstantial evidence." *Glenn*, 312 F.3d at 70; *see also United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994) ("So long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct, a conviction based on circumstantial evidence must be sustained."). Thus, the fact that there is no direct evidence that petitioner set either fire is not dispositive, as the jury could have reasonably inferred guilt beyond a reasonable doubt from the overwhelming circumstantial evidence.

When viewed in the light most favorable to the prosecution, the record could lead a rational juror to conclude that the petitioner was guilty beyond a reasonable doubt of the crimes of which he was convicted. The Court concludes that the Appellate Division's decision that petitioner's conviction was based on sufficient evidence was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record. Therefore, habeas relief is denied on this claim.

### 3. Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective, thus depriving him of his constitutional right to counsel. His argument is based on defense counsel's failure to follow the statutory notice provisions regarding use of psychiatric evidence and counsel's failure to move for a mistrial or adjournment upon the allegedly untimely disclosure of *Brady* material. Because any deficiencies in trial counsel's performance did not prejudice the defendant, the Appellate Division's conclusion that petitioner "was not denied the effective assistance of counsel," *Singh*, 875 N.Y.S.2d at 554, was neither contrary to, nor based on an unreasonable application of, clearly established federal law. Therefore, the Court denies habeas relief.

### a. Legal Standard

Under the standard promulgated in *Strickland v. Washington,* 466 U.S. 688 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: that (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 680, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner,* 417 F.3d at 319 (quoting *Rompilla v. Beard,* 545 U.S. 374, 408 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner,* 417 F.3d at 319 (quoting *Strickland,* 466 U.S. at 691). "'A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord,* 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* (citing *Strickland,* 466 U .S. at 690-91). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 588 (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to the defendant. The defendant is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they "undermine confidence in the outcome." *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland,* 466 U.S. at 694). "The question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole,* 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland,* 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland,* the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner,* 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson,* 13 F.3d 528, 534 (2d Cir. 1994)).

This Court proceeds to examine the petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir. 2004).

b. Application

Petitioner claims that defense counsel was deficient for failing to follow statutory notice requirements regarding the usage of psychiatric evidence and for not moving for mistrial or adjournment upon discovery of alleged *Brady* material. Whether or not these actions were objectively unreasonable,

they did not prejudice the petitioner. Therefore, the Court rejects this claim.

Defense counsel's actions were not objectively unreasonable. There may have been strategic reasons for counsel's failure to provide timely notice—for example, respondent argues that counsel was attempting to "sandbag" the prosecution with psychiatric evidence. Furthermore, defense counsel may have failed to provide notice because he did not believe at the time that petitioner had a good chance of demonstrating mental disease or defect.[25] With regard to petitioner's *Brady* claim, as respondent argues, failure to move for a mistrial or adjournment could have been motivated by a belief that this action would have been more detrimental to the petitioner. Furthermore, as discussed above, such a motion would have been unlikely to have been granted, meaning counsel was justified in not bringing it. However, given that any deficiencies were not prejudicial, the Court need not decide if the petitioner has satisfied the first prong of *Strickland*.

Petitioner's claim must fail because he cannot demonstrate prejudice from any alleged deficiencies. As noted above, even if the psychiatric evidence had been introduced, this evidence would not have had an impact on the outcome of petitioner's trial. Even assuming that petitioner is

mildly mentally retarded, there is no reasonable probability that evidence of his reduced mental capacity would have created a reasonable doubt in the jury's mind when viewing the record as a whole. *See supra* Section III.B.1.a. Neither the exclusion of this evidence by the trial court nor counsel's failure to properly introduce it prejudiced the petitioner.

Likewise, moving for an adjournment or mistrial in light of the alleged *Brady* violation would not have had an effect on the outcome of the trial and any error on the trial counsel's part was harmless. As discussed above, the evidence of the windshield incident was neither suppressed nor material under *Brady*. *See supra* Section III.B.1.b. As such, the trial court would have likely denied a defense motion for mistrial or adjournment, meaning there is no reasonable probability that making such a motion would have affected the outcome of the trial. *See Bennett v. Spitzer*, No. 05-CV-1399 (JFB), 2007 WL 389213 at *12–13 (E.D.N.Y. Jan. 31, 2007) (rejecting habeas petitioner's ineffective assistance of counsel claim based on failure to raise *Brady* objection because any such objection would have been meritless because no *Brady* violation existed). *Cf. Gueits v. Kirkpatrick*, 612 F.3d 118, 124 (2d Cir. 2010) (finding no prejudice from trial counsel's failure to move to exclude grand jury testimony because motion was unlikely to succeed). Furthermore, as previously noted, the petitioner was still able to get this evidence in front of the jury. Notwithstanding counsel's supposedly deficient performance, petitioner was able to put forth his theory that there was someone else with the motive to set both the apartment fire and the SUV fire. Given the entirety of the evidence against the petitioner and the dubious probative value of the petitioner's proffered theory that Holika's brother had the motive to set the fire, there is no reasonable

---

[25]   Petitioner alleges that his trial counsel acknowledged at trial that failure to provide timely notice was simply the result of his oversight. (Reply at 15.) However, petitioner mischaracterizes trial counsel's statements. The only admission trial counsel made was that he should have raised the issue of severing the indictment earlier and that it was his fault that he failed to do so earlier instead of on the eve of trial. (T. at 7.) Trial counsel never admitted to simply overlooking filing a timely notice.

probability that an adjournment or mistrial would have allowed counsel to develop this theory into one that would have created a reasonable doubt in the jury's mind.

Because there was no prejudice resulting from trial counsel's allegedly deficient performance, the Court concludes that the Appellate Division's determination that petitioner received effective assistance of counsel was neither contrary to, nor based on an unreasonable application of, clearly established federal law.

* * *

In sum, the petitioner's claims regarding the exclusion of psychiatric evidence and late disclosure of *Brady* material are procedurally barred. Additionally, the Appellate Division's decision on the merits rejecting all four of petitioner's claims was not contrary to, or based on an unreasonable application of, clearly established law, nor was it an unreasonable determination of the facts in light of the state court record. Thus, the petition must be denied in its entirety.

IV. CONCLUSION

For the foregoing reasons, the petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 20, 2011
Central Islip, New York

* * *

The petitioner is represented by Jonathan I. Edelstein, Esq., 271 Madison Avenue, 20th Floor, New York, N.Y. 10016. The attorneys for the respondent are Andre K. Cizmarik, Esq., Special Assistant District Attorney, 750 Lexington Avenue, New York, N.Y. 10022, and Alison A. Reuter, Esq., Edwards & Angell LLP, 2800 Financial Plaza, Providence R.I. 02903.